# NOTARIAL CERTIFICATE

## TO ALL TO WHOM THESE PRESENTS SHALL COME

I, **GOH LIN LING**, a **NOTARY PUBLIC** duly authorised and appointed, practising in the Republic of Singapore, **Do Hereby Certify and Attest** that on this 1st day of March 2018, I witnessed Delphine Ho, the Registrar of Singapore International Arbitration Centre, duly signed the attached document certifying an authentic award in respect of **SIAC ARBITRATION NO. 123 OF 2011 (ARB123/11/MJL)** and the signature on the attached document purporting to be that of Delphine Ho is her true signature and proper handwriting.

**IN FAITH AND TESTIMONY WHEREOF** I have hereunto subscribed my name and affixed my Seal of Office at Singapore, this 1st March 2018.

**WHICH LATTEST**



**GOH LIN LING**
**NOTARY PUBLIC**
**SINGAPORE**

Goh Lin Ling
N2017/0089
1 Apr 2017 – 31 Mar 2018

SIAC ARBITRATION NO. 123 OF 2011 IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE (4ᵗʰ EDITION, 1 JULY 2010) BETWEEN RACHAN DAMIDI REDDY ("CLAIMANT") AND RASHID A. BUTTAR ("RESPONDENT")

Pursuant to the appointment of the Registrar of the Singapore International Arbitration Centre by the Minister of Law of the Republic of Singapore under Section 19C of the International Arbitration Act (Cap. 143A) and the International Arbitration (Appointed Persons under Section 19C) Order 2009 as a person who may authenticate arbitral awards, I, Delphine Ho, the Registrar of the Singapore International Arbitration Centre, hereby certify that the attached *Final Award* dated 10 April 2015 ("*Final Award*"), including the *Clarification of Award* dated 2 June 2015 ("*Clarification*"), is an authentic award published in Singapore by the arbitral tribunal comprised of Mr Goh Joon Seng in arbitration proceedings conducted under the auspices of the Singapore International Arbitration Centre. The attached *Final Award* and *Certification* have been registered in the Singapore International Arbitration Centre Registry as Award No. 029 of 2015 on 13 April 2015 and Award No. 042 of 2015 dated 3 June 2015, respectively.

Under Section 19B(3) of the International Arbitration Act (Cap. 143A), an arbitral award is made when it has been signed and delivered in accordance with Article 31 of the UNCITRAL Model Law on International Commercial Arbitration (1985). The attached *Final Award* was delivered to the Claimant through its counsel, Baker & McKenzie, Wong & Leow at 8 Marina Boulevard, #05-01, Marina Bay Financial Centre, Tower 1, Singapore 018981 and to the Respondent through its counsel, The Law Firm of Castillo, Bonifacio & Santayana at 5ᵗʰ Floor, Builder's Center Building, 170 Salcedo St., Legaspi Village, Makati 1229, Republic of the Philippines. Consequently, the attached *Final Award* is now final and binding on the parties. The *Clarificiation* was delivered to the Claimant through its counsel, as stated above, and to the Respondent at 19620 West Catawba Avenue, Suite 100, Cornelius, NC 28031, United State of America, copying its counsel, as stated above, by email.

Signed at Singapore )
By the abovenamed )
Delphine Ho )
this 1ˢᵗ day of March 2018 )

Before me,

Notary Public

*Notary Public stamp: NOTARY PUBLIC — Goh Lin Ling — N2017/0089 — 1 Apr 2017 – 31 Mar 2018 — SINGAPORE*

# AT THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

## IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE SIAC RULES (4TH EDITION, 1 JULY 2010) ("SIAC RULES 2010")

### ARB No. 123 of 2011

Between

## RACHAN DAMIDI REDDY
*(Claimant)*

And

## RASHID A. BUTTAR
*(Respondent)*

---

## FINAL AWARD

---

Dated this 10th day of April 2015

Registered in SIAC Registry of Awards as:
Award No. 029 of 2015
on 13 April 2015



AT SINGAPORE INTERNATIONAL ARBITRATION CENTRE

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION
RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE
SIAC RULES (4TH EDITION, 1 JULY 2010)

SIAC ARBITRATION NO: 123 OF 2011

Between

RACHAN DAMIDI REDDY

... *Claimant*

And

RASHID A. BUTTAR

... *Respondent*

| | |
|---|---|
| *Coram:* | GOH JOON SENG, *Arbitrator* |
| *Counsel:* | *Andy Leck, Shum Wai Keong and Jennifer Fong (Baker & McKenzie. Wong & Leow) for the Claimant* |
| | *Sesinando S. Santayana, Jr. (The Law Firm of Castillo, Bonifacio and Santayana) for the Respondent* |
| *Hearing:* | *4 July 2014* |

## FINAL AWARD

*The background*

1. The Claimant, Rachan Damidi Reddy ("the Claimant") is the holder of United States of America Passport No. 039628331 and at all material times resided at 74/10A, Hai Ba Trung Street, District 1, Ho Chi Minh City, Vietnam and also at A1-01 My Gia 1, Phu My Hung, District 7, Ho Chi Minh City, Vietnam.

1

2.    The Respondent, Rashid A. Buttar ("the Respondent") is the holder of British Passport No. 704337601 and resides at and or has the following correspondence addresses:

    (a)    95 Shaftesbury Avenue, Feltham, Middlesex, TW14, United Kingdom;

    (b)    14316 Beatties Ford Road, Huntersville, NC 28078, United States of America; and

    (c)    c/o Advanced Concepts in Medicine, 19620 West Catawba Ave, Cornelius, NC 28031, United States of America.

3.    Elysian Fields Property Holdings Corporation ("Elysian'), Kurmadwip Holdings Inc. ("KHI") and Amred Palawan Corporation ("AMRED") are companies or entities incorporated or registered in the Philippines.

4.    The Respondent is the owner of KHI, holding 40% of its issued share capital. The remaining 60% of the issued share capital of KHI is held directly and indirectly by AMRED, a company or firm owned by the Respondent. Therefore the Respondent is the ultimate owner of KHI.

5.    It was represented by or on behalf of the Respondent to the Claimant that Elysian owned the northern and southern portions of the Dumanpalit Island situated at Chcey, Busuanga, Palawan, Philippines ("the Land"). However, by a Deed of Absolute Sale between Elysian and KHI executed in 2004, Elysian agreed to assign to KHI, all its rights and interest in the Land. Further, by a Long Term Lease Agreement executed in 2004, KHI had leased the Land to one Nico Kuyt, who in turn, assigned all his rights and interest thereunder to the Respondent. The detailed devolution of title is shown in the flowchart below:

2

## FLOWCHART REGARDING OWNERSHIP OF DUMANPALIT ISLAND



Case 3:18-cv-00172-FDW-DSC   Document 1-1   Filed 04/06/18   Page 6 of 48

6.      It was while looking for properties in the Busuanga area through an online
        property portal that the Claimant came across the Land. He obtained the contact
        particulars of the Respondent through the previous owner. Following a site visit
        and negotiations through solicitors the Claimant acquired the Land for
        US$3,000,000.00. The transaction was effected through the Claimant's purchase
        of the Land by a Share Sale and Purchase Agreement dated 21st June 2010 ("the
        Agreement"). By the terms of the Agreement between the Claimant as Purchaser
        and the Respondent as Vendor:

        (a)     the Respondent agreed to sell and the Claimant agreed to purchase the
                Respondent's 40% share capital in KHI.

        (b)     the Respondent agreed to sell and the Claimant agreed to purchase the
                Respondent's 100% share capital in AMRED.

        (c)     the Respondent agreed to effect transfer of, *inter alia*, the Land from
                Elysian to KHI.

7.      Thus through his acquisition of the Respondent's 40% shareholding in KHI and
        his 100% share capital of AMRED which was a 60% shareholder in KHI, the
        Claimant would effectively become sole owner of the Land.

8.      The salient clauses of the Agreement include the following:

        (a)     Clause 2.1: Satisfactory Due Diligence

                *"Unless otherwise agreed, the obligations in this Agreement are
                conditional upon:*

4

    (a)      *The Purchaser being satisfied with the outcome of the due diligence exercise being conducted over the Companies and ELYSIAN FIELDS PROPERTY HOLDINGS CORPORATION ("Elysian") vis-a-vis the equity and assets of the Companies and Properties of Elysian;*

     ... "

(b)      Clause 2.1 (b), which defines the Land and the documents relating to the Land, reads:

     *"All Tax Declaration(s), Certificates of Ownership, Rights of Use, Leasehold agreements, governmental approvals, registrations or Title(s) covering Tax Declaration No. 004-0459-A dated 17 November 2005 and with Property Index No. 066-07-004-18-001 (formerly Tax Declaration No. 07-0557-A dated 17 June 2003) and Tax Declaration No. 004-0460-A dated 17 November 2005 with Property Index No. 066-07-004-18-002 (formerly Tax Declaration No. 07-0558-A dated 17 June 2003) collectively referred to as the* [sic] *(the "Properties") in the name of Elysian being transferred and registered in the name of KHI within twenty (20) business days from wire transmittal of the funds by the Purchaser to the Vendor of the proportionate Purchase Price referred to in Clause 4.4 (a) of this Agreement.*

Case 3:18-cv-00172-FDW-DSC    Document 1-1    Filed 04/06/18    Page 8 of 48

*The details of (i) the foregoing documents to be transferred to KHI and (ii)*

*the original copies of the documents as stated under Schedule 1 of this*

*Agreement to be turned over to the Purchaser on or prior to Completion."*

9.      Clause 2.2 entitles the Claimant to, *inter alia*, terminate the Agreement if any of
        the conditions in Clause 2.1, Clause 3 and Clause 4 of the Agreement are not
        fulfilled. It reads:

*"2.2    Termination*

*The Purchaser and/or his designates shall have the right to immediately terminate*

*this Agreement, at his/its sole discretion, at any time, if any of the conditions*

*under Clause 2.1, Clause 3 and Clause 4 of the Agreement are not fulfilled on the*

*`specific periods referred to under Clause 2.1, Clause 3 and Clause 4 of the*

*Agreement. However, with regard to Clause 4.4 of the Agreement, failure on the*

*part of the Vendor to strictly comply with any of the prescribed transfers of*

*Shares and Properties referred to in Clause 4.4 of this Agreement shall entitle*

*the Purchaser and/or his designates to terminate this Agreement at his/its sole*

*discretion, at any time. In the event of such termination, the Vendor shall repay*

*in full to the Purchaser and/or his designates all the payments previously*

*remitted/paid to the Vendor within five (5) business days from notice of*

*termination issued by the Purchaser to his/its designates to the Vendor."*

10.     Clause 3: 'Sale and Purchase of Properties and Shares' which sets out the primary
        obligations of the parties, reads:

6

"(a)    *Subject to the terms of this Agreement, the Vendor hereby agrees to sell and procure the transfer of the Shares, and the Purchaser hereby agrees to purchase the Shares, free and clear of any security interest and with all rights, interests and claims attaching to them. The Purchaser shall pay the Vendor in tranches, and the Vendor shall transfer the Shares to the Purchaser or his designate in proportion to the amount of the Purchase Price already paid, as outlined below in Clause 4.4, within ten (10) business days from wire transmittal of funds.*

(c)    *Within twenty (20) business days from wire transmittal of the funds by the Purchaser to the Vendor of the proportionate payment of the Purchase Price as stated in Clause 4.4 (a) of this Agreement, the condition under Clause 2.1 (b) of this Agreement transferring, selling and assigning the Properties to KHI has been fully completed.*

(d)    *The Purchase Price for the sale and purchase of the Properties and the Shares to the Purchaser and/or his designates shall be in accordance with Clause 4.4 below."*

11.    Clause 4.4: 'Payment of Purchase Price by the Purchaser' which sets out the mechanism for payment by the Claimant and the transfer to him of the 40% shares in KHI and all the shares in AMRED and the Land by the Respondent reads:

*"The Purchaser shall pay the Vendor the Purchase Price and the Vendor shall transfer and assign (i) the Shares in the Companies to the Purchaser and/or his*

7

designates (nominees to be confirmed by the Purchaser) within ten (10) business days from wire transmittal of the funds representing proportionate payment of the Purchase Price by the Purchaser to the Vendor as referred to in Clause 4.4 below and (ii) the Properties to KHI within twenty (20) business days from wire transmittal of the funds by the Purchaser to the Vendor of the proportionate Purchase Price referred to in Clause 4.4 (a) of this Agreement:

(a)    (USD) Three hundred thousand (300,000) equal to an aggregate ten percent (10%) of the Purchase Price to be paid by the Purchaser to the Vendor within five (5) business days from signing of the Agreement such payment to be made by wire transfer in accordance with the Vendor's bank details as described in section 4.4 below in two (2) tranche payments of five percent (5%) each or a total aggregate amount equivalent to ten percent (10%) of the Purchase Price subject to completion by the Vendor of the conditions referred to below.

(i)    Within ten (10) business days from wire transmittal of the funds representing proportionate payment of the Purchase Price by the Purchaser to the Vendor as referred to in this Clause 4.4 (a), the Vendor shall complete the following:

1.    transfer to the Purchaser and/or his designates shares in KHI equivalent to ten percent (10%) of the forty percent (40%) share in the outstanding capital stock in KHI owned legally and/or beneficially by the Vendor;

8

2.     transfer to the Purchaser and/or his designates shares in AMRED equivalent to ten percent (10%) of the forty percent (40%) share in the outstanding capital stock in AMRED owned legally and/or beneficially by the Vendor;

3.     transfer to the Purchaser and/or his designates nominees shares in AMRED equivalent to ten percent (10%) of the sixty percent (60%) share in the outstanding capital stock in AMRED owned legally and/or beneficially by the Vendor;

4.     completion of all conditions precedent required for the transfer of the Shares in the Companies in favor of the Purchaser and/or his designates as referred to in the Agreement.

(ii)     Within twenty (20) business days from wire transmittal of the funds representing proportionate payment of the Purchase Price by the Purchaser to the Vendor as referred to in this Clause 4.4 (a), the Vendor shall complete the following:

1.     transfer of the Properties to KHI;

2.     completion of all conditions precedent required for the transfer of the Properties to KHI as referred to in the Agreement.

(b)     (USD) Six hundred thousand (600,000) equal to twenty percent (20%) of the Purchase Price to be paid by the Purchaser to the Vendor within

Case 3:18-cv-00172-FDW-DSC   Document 1-1   Filed 04/06/18   Page 12 of 48

*fifteen (15) business days from completion by the Vendor of the transfer of Shares and Properties referred to in Clause 4.4 (a) above such payment to be made by wire transfer in accordance with the Vendor's bank details below subject to the conditions referred to below.*

(i)    *Within ten (10) business days from wire transmittal of the funds representing proportionate payment of the Purchase Price by the Purchaser to the Vendor as referred to in this Clause 4.4 (b), the Vendor shall complete the following:*

1.    *transfer to the Purchaser and/or his designates shares in KHI equivalent to an additional twenty percent (20%) of the forty percent (40%) share in the outstanding capital stock in KHI originally owned legally and/or beneficially by the Vendor;*

2.    *transfer to the Purchaser and/or his designates shares in AMRED equivalent to an additional twenty percent (20%) of the forty percent (40%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;*

3.    *transfer to the Purchaser and/or his designates nominees shares in AMRED equivalent to an additional twenty percent (20%) of the sixty percent (60%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;*

10

4.      *completion of all conditions precedent required for the transfer of the Shares in the Companies in favor of the Purchaser and/or his designates as referred to in the Agreement.*

(c)    *(USD) Six hundred thousand (600,000) equal to twenty percent (20%) of the Purchase Price to be paid by the Purchaser to the Vendor within fifteen (15) business days from completion by the Vendor of the transfer of Shares referred to in Clause 4.4 (b) above such payment to be made by wire transfer in accordance with the Vendor's bank details below subject to the conditions referred to below.*

(i)    *Within ten (10) business days from wire transmittal of the funds representing proportionate payment of the Purchase Price by the Purchaser to the Vendor as referred to in this Clause 4.4 (c), the Vendor shall complete the following:*

1.      *transfer to the Purchaser and/or his designates shares in KHI equivalent to an additional twenty percent (20%) of the forty percent (40%) share in the outstanding capital stock in KHI originally owned legally and/or beneficially by the Vendor;*

2.      *transfer to the Purchaser and/or his designates shares in AMRED equivalent to an additional twenty percent (20%) of the forty percent (40%) share in the outstanding capital*

11

*stock in AMRED originally owned legally and/or beneficially by the Vendor;*

3. *transfer to the Purchaser and/or his designates nominees shares in AMRED equivalent to an additional twenty percent (20%) of the sixty percent (60%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;*

4. *completion of all conditions precedent required for the transfer of the Shares in the Companies in favor of the Purchaser and/or his designates as referred to in the Agreement.*

(d) *Subject to the completion of the transfer of Shares and Properties as referred to in Clauses 4.4 (a), (b) and (c) above, (USD) seven hundred fifty thousand (750,000) equal to twenty five percent (25%) of the Purchase Price to be paid by the Purchaser to the Vendor on <u>01 June 2011</u> such payment to be made by wire transfer in accordance with the Vendor's bank details below in accordance with the conditions referred to below.*

(i) *Within ten (10) business days from wire transmittal of the funds representing proportionate payment of the Purchase Price by the Purchaser to the Vendor as referred to in this Clause 4.4 (d), the Vendor shall complete the following:*

12

1. transfer to the Purchaser and/or his designates shares in KHI equivalent to an additional twenty five percent (25%) of the forty percent (40%) share in the outstanding capital stock in KHI originally owned legally and/or beneficially by the Vendor;

2. transfer to the Purchaser and/or his designates shares in AMRED equivalent to an additional twenty five percent (25%) of the forty percent (40%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;

3. transfer to the Purchaser and/or his designates nominees shares in AMRED equivalent to an additional twenty five percent (25%) of the sixty percent (60%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;

4. completion of all conditions precedent required for the transfer of the Shares in the Companies in favor of the Purchaser and/or his designates as referred to in the Agreement.

(e) Subject to the completion of the transfer of Shares and Properties as referred to in Clauses 4.4 (a), (b), (c) and (d) above, (USD) seven hundred fifty thousand (750,000) equal to the remaining twenty five percent (25%) of the full Purchase Price to be paid by the Purchaser to

13

the Vendor on <u>01 December 2011</u> such payment to be made by wire transfer in accordance with the Vendor's bank details below in accordance with the conditions referred to below.

(i) Within ten (10) business days from wire transmittal of the funds representing full and final payment of the Purchase Price by the Purchaser to the Vendor as referred to in this Clause 4.4 (e), the Vendor shall complete the following:

1. transfer to the Purchaser and/or his designates shares in KHI equivalent to an additional twenty five percent (25%) of the forty percent (40%) share in the outstanding capital stock in KHI originally owned legally and/or beneficially by the Vendor;

2. transfer to the Purchaser and/or his designates shares in AMRED equivalent to an additional twenty five percent (25%) of the forty percent (40%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;

3. transfer to the Purchaser and/or his designates nominees shares in AMRED equivalent to an additional twenty five percent (25%) of the sixty percent (60%) share in the outstanding capital stock in AMRED originally owned legally and/or beneficially by the Vendor;

14

4.    *completion of all conditions precedent required for the transfer of the Shares in the Companies in favor of the Purchaser and/or his designates as referred to in Clauses 2, 3 and 4 of the Agreement.*

*For purposes of this Agreement, wire transfer or electronic transfer of funds shall be the modality by which the Purchaser shall effect payment of the Purchase Price to the Vendor. The electronic funds transfer to the bank account(s) of the Vendor, details of which will be provided by the Vendor in writing to the Purchaser. If there is delay in providing bank account details by the Vendor, Purchaser will have additional time for wire transmittal payment following receipt of the bank account details equivalent to the same amount of time that there was delay in providing the bank account details. For example, if bank account details are provided by the Vendor to the Purchaser five (5) days after signing this agreement, the Purchaser will have five (5) additional days to place the wire transmittal order.*

*No prepayment penalty of interest due if principal is paid early. Interest would be recalculated for term used. Transfer of Shares of the Companies in the name of the Purchaser shall be made within ten (10) business days from wire transmittal of payment to the Vendor as referred to above.*

*The Purchaser shall pay to the Vendor interest on that part of the Purchase Price which remains outstanding at any given time. Interest will be at the one (1) year LIBOR rate on the day of signing of this agreement plus an additional two percent (2%). Interest will be compounded every three (3) months. Total interest for the*

15

*year will be calculated and divided into four (4) payments occurring every three (3) months."*

12.     The Agreement was signed on 21 June 2010. Shortly thereafter, at the request of the Respondent the Agreement was varied on or about 16 July 2010 as confirmed by Mr. Noel C. Ducusin ("Noel"), External Counsel, N. Ducusin & Partners Law Offices acting for the Respondent as follows:

"...

2.     *Transfer of the property from Elysian fields to KHI will then commence. Simultaneously, stock certificates will be prepared in the name of Oasis Landholdings and Rachan's nominee for 50% share of both Amred and KHI which shall be held by me. Property transfer from Elysian Fields to KHI is expected to be completed in 20 days.*

3.     *Upon transfer of the property from the name of Elysian Fields to KHI, Rachan shall simultaneously pay the full balance of the purchase price of the shares of Amred and KHI to Rashid and at the same time stock certificate of Rachan mentioned in no. 2 above will be transferred to Rosemarie.*

..."

"Rosemarie" refers to the member of the office of Sicangco & Sicangco Law Offices acting for the Claimant in the purchase of the Land. "Rachan" refers to the Claimant. "Rashid" refers to the Respondent.

16

13. By email of 17 July 2010 from the Claimant though addressed to the Respondent with copy to the Respondent's solicitor, Noel, the Claimant confirmed with Noel that he was ready to transfer 50% of the Purchase Price pursuant to the variation to the Agreement. The email reads:

*"Noel,*

*I just wanted to follow up with you on this email thread to relay a few items. Rashid and I chatted after the call. As Rashid and I discussed, the below items are fine. Just update me and let me know when to wire funds. I have two wires that i have ready with the bank. Each for 20% so let me know. one is scheduled to go out Monday (in two days). i will just continue with this so there is 30% already paid. just the remaining 20% wire will be left. just let me know when to wire. will cover transfer tax from KHI to Oasisland so the second item that Rashid put forward below is also ok for all parties.*

*... "*

Oasisland is a British Virgin Islands corporate vehicle of the Claimant intended to be the transferee of the Land upon completion of the sale and purchase of the Land.

14. By email dated 19 July 2010 to the Claimant, Noel confirmed as follows:

17

*"... I'm attaching in excel the final transfer sequence that reflects this concern of Rosemarie that at the same time takes into account our new simplified one time stock transfer procedure for the whole 50% of the shares.*

*Per Rashid, the remaining payments for the 20% will be upon the transfer of title from Elysian into KHI and the other 20% upon transfer of the shares (with responsibility for paying the taxes on the share transfer for your account).*

*In actual procedure, the next 20% payment from your end can be made when the property is transferred successfully from Elysian to KHI because at this point, KHI will now be worth the acquisition as it will already have the property evidence of title in its name. Then after that, the final 20% can be paid simultaneous with the issuance of the 50% share of both companies in your name per the attached excel sheet. ..."*

15. Between 22 June 2010 and 17 November 2010, the Claimant paid to the Respondent in seven tranches, a total of US$1,550,000.00 constituting 50% of the Purchase Price pursuant to Clause 4.4 of the Agreement as varied with the balance of US$50,000.00 for payment of taxes as requested by the Respondent.

16. However after receiving this admitted sum of US$1,550,000.00 the Respondent failed to transfer to the Claimant the proportionate or any of his shares in KHI and AMRED.

17. Meanwhile, after his payment of US$1,550,000.00 to the Respondent, the Claimant received news that an indigenous tribe identified as the Tagbanua tribe

18

had claimed ownership over the Land. The Claimant accordingly instructed his solicitors to investigate into this ancestral claim.

18. It transpired that an application for a Certificate of Ancestral Domain Title ("CADT") had been made by the Tagbanua tribe on 24 January 2007. This would be more than 3 years before the Agreement was entered into on 21 June 2010. Further the application had been approved by the National Commission on Indigenous Peoples ("NCIP") on 27 January 2010 that is 6 months before the date of the Agreement. This meant that both the Respondent and KHI were not in a position therefrom to sell or dispose or effect transfer of title to the Land to anyone. Hence the Respondent would not be able to carry out his obligations of a vendor undertaken by him under the Agreement.

19. This disclosure took the Claimant by surprise as he had been specifically assured by the Respondent's solicitor that no such encumbrances on the Land existed, vide the answers to the title requisitions by Rosemarie and the replies by Noel as the Respondent's solicitor referred to as "NCD" of 5 April 2010:

> "C. *Department of Environment and National Resources (DENR) / Community Environment and Natural Resources Office (CENRO)*
>
> 1. ...
>
> 2. *Written confirmation from the DENR whether it issued a Certificate of Ancestral Domain Claim ("CADC") over the subject properties described in the Tax Declarations.*

Case 3:18-cv-00172-FDW-DSC   Document 1-1   Filed 04/06/18   Page 22 of 48

*(NCD: You can get a "Certificate of No Record" for this from the DENR. As far as we know, there was no such Certificate Issued. In fact, the property is still covered by a Flag T (steward ship long term land lease in the name of the predecessor's in interest of the Elysian Fields Property Holding Corporation).*

D.      Palawan Council for Sustainable Development ("PCSD")

1.      In relation with Part I C item 2, any related documents on relevant consents of the Indigenous Cultural Community/Indigenous Peoples, if the area applied covers an ancestral land/ancestral domain.

*(NCD: Not applicable. Please see answer to No. C.2 above.)*

E.      National Commission on Indigenous People ("NCIP")

1.      To determine whether a certification as a pre-condition to the grant of permit, lease, grant, or any similar authority for the disposition, utilization, management and appropriation by any private individual, corporate entity or any government agency, corporation or subdivision thereof on any part or portion of the ancestral domain taking into consideration the consensus approval of the ICCs / IPs [Indigenous Cultural Community / Indigenous Peoples] concerned is required.

*(NCD: Not applicable. Please see answer to No. C.2 above.)*

F.      Any other documents and agreements relating to existing Mortgage contracts, those involving easements and other liens and encumbrances on the subject properties covered by the Tax Declarations.

*(NCD: Long Term Lease Agreement and Deeds of Sale as security devices in name of Kurmadwip Holdings, Inc. to keep Elysian Fields in line. Rights*

.

20

*thereunder assigned to Dr. Buttar by Nico Kuyt, owner of Kurmadwip Holdings and previous owner of the corporation. We can send you copies of these.)"*

20. There was no mention of or reference to any CADT in Noel's replies to the requisitions. Instead there was an affirmation that the *"the property is still covered by a Flag T (steward ship long term land lease in the name of the predecessor's in interest of the Elysian Fields Property Holding Corporation)."*

21. The Tribunal therefore finds the Respondent in breach of his representations and warranties under Clause 5.1: Representations and Warranties by the Vendor:

*"The Vendor hereby agrees, declares, represents and warrants to the Purchaser that:*

*...*

*(c)     The Properties are free and clear of any lien, encumbrance, security interest and with all rights, interests and claims attaching to them;*

*...*

*(e)     The Vendor warrants that KHI can validly and legally own the Properties;*

*(f)     The Vendor has full power and authority to enter into and perform this Agreement and the provisions of this Agreement shall have full force and binding effect on the Vendor.*

*..."*

21

22.     Notwithstanding his own breach of warranty, the Respondent on 24 April 2011
        put forward 3 options encapsulated in his email to the Claimant as follows:

> "*Rachan,*
>
> *As per our discussion, here are the 3 options:*
>
> *Option 1 – I consummate a deal with another buyer for the island who has offered
> 4.2 million cash for Dumanpalit. However, he is unable to consummate the
> transaction until late June to mid July. In this option, I would pay you back what
> you've paid to me so far as soon as the deal is consummated. There would be no
> transfer of stock to you. Essentially you get an "out" from the deal, if that is what
> you want.*
>
> *Option 2 – We continue with our deal as it is, but we close everything by June
> 30th, which is 9 days after the next payment is due to me anyway. This way, there
> is no issue with how much stock is transferred, etc. It's all done immediately
> upon my having received the final payments, plus all interest due. I will take care
> of Noel from my side but you are obligated to pay what ever taxes that are due
> upon transferring the property from AMRED to Oasis. In this option, I will
> provide the name of the serious potential buyer and his contact information to you
> in case you wish to pursue that option. In addition, if you sell the island to this
> individual, I will get 25% of the difference as an introduction commission, or 25%
> of 4.2 million minus 3 million (or 25% of 1.2 million = $300,000.00).*
>
> *Option 3 – This option is the only option that provides a solution for what I need
> immediately. This option is the same as No. 2 above with the following*

Case 3:18-cv-00172-FDW-DSC   Document 1-1   Filed 04/06/18   Page 25 of 48

differences: a.) the transaction between you and I must be completed by April 30th, b.) you would wire the money to 3 different accounts (trust accounts or escrow accounts of attorneys) so that my two houses and the business that I have already paid 66% on, are all paid off. This amount would total about 1.45 million, c.) the remaining balance of $50,000.00 as well as all the interest due which would be about another $95,000.00, I would totally discharge and finally, d.) the information of the potential serious buyer would be turned over to you as in Option 2. However, if you DO consummate a transaction on the island with this gentleman, I would waive any introduction commission. Thus Option 3 is different from Option 2 in that it must be done by April 30th, I waive all interest, you save an additional $50,000.00 and no introduction commission will be due to me if you decide to sell the island.

The options for you are really only Option 2 or Option 3. I will have no option but to proceed with Option 1 automatically if you can't or do not opt to act upon on either Option 2 or Option 3 by the date the next payment is due. This is obviously due as a result of my situation and circumstances. The additional incentives are only in place if you hit the date by April 30, 2011.

... "

23.    The Respondent's offer met with a swift and short reply the next day from the Claimant as follows:

*"... the only option I can consider is option 1 essentially unwinding the share*
*purchase agreement, the timeline for payment on the buyout of my shares in khi /*
*amred would have to begin over the next 2-3 weeks but I would also need to have*
*any additional terms to consider further (so please forward when you have a free*
*moment). ..."*

24.    The Respondent did not come up with any proposals to move things forward.

25.    On 2 September 2011, the Claimant demanded through his solicitors, M/s Baker
       & McKenzie.Wong & Leow ("Baker McKenzie") of the Respondent as follows:

       *"...*

       *8.      Further, we are instructed that on or around 6 January 2011, the*
       *Government of the Republic of the Philippines issued a Certificate of Ancestral*
       *Domain Title ("CADT"), which grants title over the Properties to the indigenous*
       *people who had claimed for the ownership of the Properties. We are further*
       *instructed that the issuance of the CADT to the indigenous people prevents*
       *individuals (including KHI) from having any legal rights to the Properties.*

       *9.      As a result, it appears that you are no longer able to transfer the title in*
       *the Properties from Elysian to KHI in breach of your obligations under Clauses*
       *2.1(b), 5.1(c) and 5.1(e) of the Agreement.*

       *10.     As you and/or any representatives of KHI has failed, refused and /*
       *neglected to inform our client of the claims by the indigenous people over the*
       *Properties and of matters related to it (including but not limited to the issuance of*

24

the CADT), please provide to our client all documents related to the same on an urgent basis.

11.    Further, TAKE NOTICE that unless you fully refund to our client the sum of US$1,500,000 by 5.00 pm, Friday, 9 September 2011, we have strict instructions to take all necessary steps to enforce our client's rights under the Agreement against you, including but not limited to terminating the Agreement and claiming for full repayment of all sums paid to you pursuant to Clause 2.2 of the Agreement, without further reference to you.

..."

26.    On 8 September 2011, the Respondent wrote to the Claimant demanding as follows:

"...

You will pay the following amounts in FULL with funds received by 5:00 pm on September 12, 2011:

1.    $1,500,000.00 remaining portion of amount financed

2.    $74,689.00 of back accumulated interest [based] on Libor rate

3.    $300,000.00 penalty fee as indicated in paragraph 4.5 (a) of the agreement

4.    $17,500.00 in reimbursement for employee salaries + taxes which you incurred effective November 30, 2010 as per paragraph 4.6 of the agreement

25

5.      *$100,000.00 additional damages for all the aggravation caused, attorney fees, additional security and general punitive purposes, all expenses I've paid but were YOUR expenses since the contract was signed in June 2010.*

*TOTAL DUE - $1,992,189.00*

..."

27.     Following further demands by the Claimant of the Respondent to fulfill his contractual obligations under the Agreement that were not complied with the Claimant commenced these proceedings on 3 November 2011 by a Notice of Arbitration pursuant to Clause 8 (b) of the Agreement.   The said notice was served on the Respondent on or about 14 November 2011. Clause 8 (b) reads:

*"Any dispute arising out of or in connection with this contract, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ('SIAC Rules') for the time being in force, which rules are deemed to be incorporated by reference in this clause.*

*The Tribunal shall consist of one arbitrator to be appointed by the Chairman of the SIAC. The language of the arbitration shall be English."*

The applicable Rules are the Arbitration Rules of the Singapore International Arbitration Centre (4th Edition, 1 July 2010) ("SIAC Rules 2010").

26

28.   By Clause 8 (a) the Agreement is governed by the laws of Singapore.

29.   On 2 November 2012, Mr. Goh Joon Seng, an Advocate and Solicitor practising
      at c/o M/s Lee & Lee, 50 Raffles Place, #06-00 Singapore Land Tower, Singapore
      048623 was appointed sole arbitrator ("the Tribunal") by the Chairman of SIAC
      pursuant to the SIAC Rules 2010.

30.   Following his appointment, the Tribunal on 9 November 2012, notified parties of
      his appointment and requested them to revert to him within 7 days on a suitable
      date for a face to face meeting or teleconference for the purpose of issuing
      procedural directions.

31.   Receiving a reply from only the solicitors for the Claimant, the Tribunal notified
      parties by letter of 15 November 2012 that he would hold a teleconference on 16
      November 2012 at 7.00 am (Singapore time) / 6.00 pm 15 November 2012 (North
      Carolina time).   The notice was sent by both fax and email to the Claimant's
      solicitors and to the Respondent at his last known addresses at:

      (a)   Center for Advanced Medicine and Clinical Research, 19620 West
            Catawba Avenue, Suite 100, Cornelius, North Carolina, USA 28031.

      (b)   14316 Beatties Ford Road, Huntersville, North Carolina, USA 28078.

32.   The Respondent did not respond to the Tribunal's notice.   The teleconference
      scheduled to start at 7.00 am Singapore time was stood down to 7.10 am

27

Singapore time. But the Respondent did not call in. Neither did he respond to a telephone message left for him to communicate with the Tribunal.

33. The Tribunal accordingly issued the following directions which were communicated to the Respondent on the same day as follows:

> "(1)    *The Claimant is to file and serve his Points of Claim with supporting documents (if any) within eight (8) weeks commencing 16 November 2012.*
>
> (2)    *The Respondent is to file and serve his Points of Defence and Counterclaim with supporting documents (if any) within eight (8) weeks from the 16 November 2012 or receipt of the Points of Claim whichever is the later.*
>
> (3)    *The Claimant is to file and serve his Points of Reply and Defence to Counterclaim with supporting documents (if any) within four (4) weeks from receipt of the Respondent's Points of Defence and Counterclaim.*
>
> (4)    *Parties are to exchange list of documents within six (6) weeks from date stipulated herein for the filing and service of the Claimant's Points of Reply and Defence to Counterclaim followed by inspection of documents within two (2) weeks therefrom.*
>
> (5)    *Parties will then appear before me for further directions on a date and time to be fixed.*
>
> (6)    *Costs of and related to the issue of these procedural directions reserved."*

Case 3:18-cv-00172-FDW-DSC   Document 1-1   Filed 04/06/18   Page 31 of 48

34.     On or about 11 January 2013, the Claimant's solicitors received the Respondent's

        Manifestation with Objection to Jurisdiction dated 26 December 2012 served by

        Attorney Sesinando S. Santayana Jr. ("Attorney Santayana Jr."). In substance the

        Respondent's position set out therein is:

        (a)     The Claimant's claim is based on a purchase agreement which the

                Claimant did not sign. (1st Ground of Objection)

        (b)     Assuming that the Claimant did sign the said agreement dated 21 June

                2010, it was not the latest version of the same and was just a working

                draft. (2nd Ground of Objection)

35.     On 11 January 2013, the Claimant through Baker McKenzie filed and served his

        Statement of Claim claiming:

        (a)     An award pursuant to Clause 2.2 of the Agreement that:

                (i)     the Agreement is lawfully terminated.

                (ii)    the Respondent repay in full to the Claimant all sums previously

                        paid to him by the Claimant pursuant to the Agreement.

        (b)     Alternatively, an award that:

                (i)     the Agreement is terminated; and

                (ii)    The Respondent pay to the Claimant damages to be assessed for

                        losses suffered at least US$1,550,000.00 due to the Respondent's

                        various breaches of the Agreement.

        (c)     Interest.

        (d)     Costs and disbursement of this arbitration; and

                                            29

(e)      Such further or other relief as the Tribunal deems fit.

36.    On 25 January 2013, the Claimant through Baker McKenzie filed his Response to the Respondent's Manifestation with Objection to Jurisdiction:

(a)      On the 1st Ground of Objection, a copy of the Agreement signed by the Claimant was annexed to the Response.

(b)      On the 2nd Ground of Objection, the Claimant's emails of 17 and 19 July 2010 vide paragraphs 13 and 14 *supra* clearly show that there was a concluded agreement as per the Agreement but varied as set out in paragraphs 13 and 14 *supra*.

37.    On 29 January 2013, the Tribunal directed as follows:

"...

*Pursuant to Rule 25.2 read with Rule 25.4 and or any other Rules under the SIAC Rules, 4th Edition dated 1 July 2010 applicable thereto, the Tribunal hereby directs that the Manifestation with Objection to Jurisdiction shall be dealt with in the Award on the merits.*

..."

38.    The Respondent did not file and serve his Points of Defence and Counterclaim as ordered by the Tribunal's directions of 16 November 2012 *supra*.

30

39.   On 22 February 2013, the Tribunal by letter addressed to Baker McKenzie and Attorney Santayana Jr. directed parties to attend before the Tribunal at the Singapore International Arbitration Centre, on Friday, 1 March 2013 at 10.00 am for a directions hearing with liberty to opt for a teleconference by notice to the Tribunal and the other party not later than 27 February 2013.

40.   At the directions hearing commencing at 10.00 am on 1 March 2013, Mr. Andy Leck and Mr. Shum Wai Keong appeared for the Claimant. No one appeared for the Respondent. Accordingly, the Tribunal stood down the hearing to 10.15 am. When it reconvened there was still no one appearing for the Respondent. The hearing then proceeded and the Tribunal issued the following directions and notified Attorney Santayana Jr. of the same. The directions read:

> "(1)   *Parties are to file and serve by 17 May 2013 their respective list of documents followed by inspection within 2 weeks therefrom.*
>
> (2)   *Hearing over 2 days in the first instance on dates to be fixed by the Tribunal and notified to parties by correspondence.*
>
> (3)   *The IBA Rules on Taking of Evidence to apply.*
>
> (4)   *Costs of this directions hearing be costs in the cause."*

41.   On 10 April 2013 at a procedural meeting attended by Mr. Andy Leck and Mr. Shum Wai Keong for the Claimant but with no one from the office of Attorney Santayana Jr. appearing for the Respondent though duly notified, the Tribunal issued the following directions:

31

"(1)    Statements of witnesses of fact including that of the Claimant to be filed and served by 22 May 2013.

(2)    Statement of expert witnesses to be filed and served by 5 June 2013.

(3)    Hearing fixed for 25 and 26 of June 2013 at the Singapore International Arbitration Centre at Maxwell Centre @ Centennial, 3 Temasek Avenue #16-01 Centennial Tower Singapore 039190.

(4)    Costs of this directions hearing be costs in the cause."

42.    These proceedings were then fixed for hearing on 3 and 4 July 2014.  As the Tribunal was medically indisposed on 3 July 2014, the hearing commenced on 4 July 2014 at the Hearing Room 412, Maxwell Chambers, 32 Maxwell Road, Singapore 069115.  The Claimant was represented by Mr. Andy Leck, Mr. Shum Wai Keong, Ms Jennifer Fong and Ms Lavina Rengarajoo of Baker McKenzie. Though notified of the date of hearing and the venue, neither the Respondent nor his Counsel was present.  Accordingly, the Tribunal stood down the proceedings for 15 minutes.  The Tribunal reconvened at 10.15 am and the proceedings resumed in the absence of the Respondent and his Counsel pursuant to *inter alia* Rules 17.9 of the SIAC Rules 2010 which reads:

*"If the Respondent fails to submit a Statement of Defence, or if at any point any party fails to avail itself of the opportunity to present its case in the manner directed by the Tribunal, the Tribunal may proceed with the arbitration."*

32

43.     Also pertinent is Rule 21.3 of the SIAC Rules 2010 which reads:

> *"If any party to the proceedings fails to appear at a hearing without showing sufficient cause for such failure, the Tribunal may proceed with the arbitration and may make the award based on the submissions and evidence before it."*

The Tribunal accordingly proceeded with the hearing.

44.     The Claimant testified on his own behalf supported by Professor Pacifico A. Agabin ("Prof. Agabin") who gave expert evidence on Philippine Law. This was followed by Written Submissions tendered on 1 August 2014 followed by a further submissions on costs tendered on 30 January 2015. The Tribunal declared the proceedings closed on 9 March 2015 pursuant to Rule 28.1 of the SIAC Rules 2010.

45.     Arising from the Claimant's Statement of Claim and the Respondent's Manifestation with Objection to Jurisdiction, there are 4 issues to be addressed:

(a)     Whether the Tribunal's jurisdiction is excluded as contended by the Respondent's Manifestation with Objection to Jurisdiction vide paragraph 34 *supra*. ("Issue 1")

(b)     Whether the Respondent was in breach of Clauses 4.4 (a), (b) and (c) of the Agreement as varied vide paragraphs 13 and 14 *supra* due to his failure to transfer the proportionate share capital in KHI and AMRED to

33

the Claimant and to effect the transfer of the Land from Elysian to KHI upon receipt of US$1,550,000.00 from the Claimant pursuant to the Agreement as varied. ("Issue 2")

(c) Whether the Claimant was entitled to terminate the Agreement pursuant to Clause 2.2 of the Agreement by virtue of the Respondent's breach of Clauses 2.1, 3, 4.4 (a), (b) and or (c) of the Agreement as varied aforesaid. ("Issue 3")

(d) Whether the Respondent was in breach of Clauses 5.1 (c), 5.1 (e) and or 5.1 (f) of the Agreement by virtue of the encumbrance of the CADT over the Land in favour of the Tagbanua tribe. ("Issue 4")

### Tribunal's findings

### Issue 1 as set out in paragraph 45(a) *supra*

46. The Respondent's Manifestation with Objection to Jurisdiction is disingenuous vide paragraph 34 *supra*. By his own email of 23 June 2010, the Respondent in forwarding a copy of the Agreement dated 21 June 2010 signed by both parties stated:

*"Rachan,*

*Here is the [Agreement] and also the other agreement (one page) that you asked for. A few of the last adendums [sic] were not signed because I didn't think they*

34

*needed to be ... but then I thought it would be better to sign then* [sic] *than NOT sign them. So the hard copies being sent, <u>have all the pages signed</u>. They did not get out today due to missing the deadline for Fed Ex but all papers are signed, witnessed and completed, ready to go out Fed Ex first thing tomorrow. Thanks Rachan. And Congratulations! BTW, I'm definitely having some "seller's remorse". Talk to you soon.*

*Hoping this finds you and yours in the best of health and spirits,*

*Dr. Rashid A. Buttar ..."* (underlining added)

The Agreement enclosed as per the said email showed all pages thereof duly signed and initialed at every page by both parties.

47. The Respondent's email of 8 September 2011 referred to in paragraph 26 *supra* was prefaced by a synopsis listing event 1: *"An agreement was reached between us in June 2010 for purchase of a property [within] 1 year to 18 months of owner financing".*

48. The Tribunal therefore dismisses the Respondent's contention on Issue 1.

   **Issue 2 as set out in paragraph 45(b) *supra***

49. Clause 2.1: Satisfactory Due Diligence reads:

35

"Unless otherwise agreed, the obligations in this Agreement are conditional upon:

...

(k)     ...

The Parties hereby agree that for each of the proportionate payment/tranche payment of the Purchaser in favor of the Vendor as referred to under Clause 4.4 (a), (b), (c) (d) (e) of this Agreement, the said proportionate payment shall be evidenced by the applicable duly executed Subscription Contract and/or Deed of Assignment of Shares of the Companies by the Vendor to the Purchaser or his designates ... within five (5) business days from receipt by the Vendor of each of the proportionate payment/tranche payment of the Purchaser as referred to under Clause 4.4 (a), (b), (c) (d) (e) of this Agreement." (underlining added)

50.     Thus by Clause 4.4 of the Agreement vide paragraph 11 *supra*, upon the Claimant making payment of a percentage of the Purchase Price, the Respondent was to effect within a specified period a transfer of the corresponding percentage of the shares in KHI and AMRED to the Claimant. In respect of Clause 4.4 (a) (ii), the Respondent on receipt of the first 10% of the Purchase Price, was to effect transfer of the Land from Elysian to KHI within twenty (20) business days. By Clause 2.1 (b), performance of this obligation was made a Condition Precedent to the performance of the parties' obligations under the Agreement.

36

51.     By agreement of the parties recorded by the email of 19 July 2010 vide paragraph
        14 *supra*, the share transfers under Clauses 4.4 (a), (b) and (c) would be effected
        by a one time share transfer of 50% of the shares.  The Claimant agreed to this to
        accommodate Noel by addressing the administrative concern that Noel expressed
        about having to process serial transfers otherwise.

52.     By the terms of Clauses 4.4 (a), (b) and (c) as varied by the agreement of 19 July
        2010, the Claimant paid as part payment of the Purchase Price the amount of
        US$1,550,000.00.   Notwithstanding that this was in excess of payments under
        Clauses 4.4 (a), (b) and (c) as varied by the Agreement of 19 July 2010, the
        Respondent refused or failed to effect within twenty (20) business days the three
        tranches in accordance with the provisions of the said Clause as varied by the
        agreement of 19 July 2010, that is to effect transfers of:

        (i)     50% of the shares in KHI;

        (ii)    50% of the shares in AMRED; and

        (iii)   The Land from Elysian to KHI.

53.     Accordingly, the Respondent was in breach of the Agreement vide Clauses 4.4
        (a), (b) and (c) as varied by the agreement of 19 July 2010.

        **Issue 3 as set out in paragraph 45(c) *supra***

54.     In the event of a breach by the Respondent of Clause 2.1 read with Clause 4, the
        Claimant's entitlement to terminate the Agreement pursuant to Clause 2.2 vide

37

paragraph 9 *supra* is clear, notwithstanding the variation to Clause 4 per the agreement of 19 July 2010.

55.    By the letter of 2 September 2011 from his solicitors, Baker McKenzie, paragraph 11, the Claimant effectively terminated the Agreement:

"... *TAKE NOTICE that unless you fully refund to our client the sum of US$1,500,000.00 by 5.00 pm, Friday, 9 September 2011, we have strict instructions to take all necessary steps to enforce our client's rights under the Agreement against you, including but not limited to terminating the Agreement and claiming for full repayment of all sums paid to you pursuant to Clause 2.2 of the Agreement, without further reference to you.*

... "

Alternatively, the Agreement had been repudiated by the Respondent when he by the terms of his email of 24 April 2011 proposed that he sells the Land to someone else for US$4.2 million and then to repay the US$1,550,000.00 paid to him by the Claimant. See paragraph 22 *supra*.

The repudiation was accepted by the Claimant by his email of 25 April 2011 vide paragraph 23 *supra*.

56.    By the letter from his solicitors of 2 September 2011 vide paragraph 25 *supra* the Claimant accepted the repudiation of the Agreement by the Respondent. This was

38

followed by the Notice of Arbitration dated 11 November 2011 and the commencement of these proceedings.

57.  The terms laid down by the Respondent by way of his email of 8 September 2011 referred to in paragraph 26 *supra* only served to confirm his repudiation of the Agreement. This entitled the Claimant to terminate the Agreement.

**Issue 4 as set out in paragraph 45(d) *supra***

58.  By Clause 5.1 (c), the Respondent represented and warranted that the Land was "*free and clear of any lien, encumbrance, security interest and with all rights, interests and claims attaching to them*".

59.  By Clause 5.1 (e), the Respondent represented and warranted that "*KHI can validly and legally own the [Land]*".

60.  By Clause 5.1 (f), the Respondent represented and warranted that he had "*full power and authority to enter into and perform this Agreement and the provisions of this Agreement shall have full force and binding effect on [him].*"

61.  These representations and warranties were made in the Agreement of 21 June 2010.

39

62.    The Land was part of Dumanpalit Island.  It transpired that Dumanpalit Island
       was the subject matter of an application by the Tagbanua tribe to the NCIP for a
       CADT filed on 24 January 2007.  The application was approved by the NCIP on
       27 January 2010.  Thereupon neither Elysian nor the Respondent could acquire
       any property rights over the Land and hence could pass no valid title to the
       Claimant under the Agreement of 21 June 2010.

63.    The Respondent was therefore in breach of Clauses 5.1 (e) and (f) of the
       Agreement.

64.    Accordingly, the Tribunal hereby declares and awards:

       (a)    The Agreement dated 21 June 2010 is lawfully terminated by the
              Claimant.

       (b)    The Respondent is ordered to repay in full to the Claimant the monies
              previously paid to him by the Claimant amounting to US$1,550,000.00
              pursuant to the Agreement as varied by the letter of 19 July 2010.

       (c)    The Respondent is ordered to pay interest on the sum of US$1,550,000.00
              at the rate of 5.33% per annum from date of commencement of this
              Arbitration to date of this Award.

65.    On costs, the pertinent rule is Rule 31.2 of the SIAC Rules 2010.  It reads:

       *"The term 'costs of the arbitration' includes:*

       *a.     the Tribunal's fees and expenses*

                                          40

b.      the [SIAC's] administrative fees and expenses; and

c.      the costs of expert advice and of other assistance required by the
        Tribunal."

66.    The power of the Tribunal to award costs is specifically provided by Rule 33 of
       the SIAC Rules 2010 which reads:

       "33.   *Party's Legal and Other Costs*

              *The Tribunal shall have the authority to order in its award that all or a*
              *part of the legal or other costs of a party (apart from the costs of the*
              *arbitration) be paid by another party."*

67.    The Claimant claims costs incurred in connection with these proceedings as
       follows:

       (a)    The Tribunal's fees and expenses to be determined by SIAC, including
              deposits to the amount of the same paid by the Claimant.

       (b)    Reimbursement of the Claimant's solicitor and client costs and
              disbursements paid or payable to Baker McKenzie in the sum of
              US$381,479.34.

       (c)    Administrative fees and expenses of SIAC to be determined by the
              Tribunal in consultation with SIAC.

       (d)    Fees and expenses of the Claimant's expert witness Prof. Agabin totaling
              US$26,550.68 including disbursements of US$1,421.16.

41

(e)    Other expenses and disbursements totaling US$7,231.96 being S$1,059.30 for rental for the hearing room, S$5,451.65 for transcription services, travel and accommodation expenses incurred by the Claimant amounting to US$462.00, S$32.96 and VND39,949.676.00.

68.    Accordingly, on costs, the Tribunal awards to the Claimant to be paid by the Respondent the following:

(a)    US$381,479.34 for legal fees and disbursements.

(b)    US$26,550.68 being fees and disbursements of the expert witness Prof. Agabin.

(c)    US$7,231.96 being other expenses incurred in connection with the arbitration.

(d)    Costs of the arbitration totaling S$79,439.80 being:

    (i)    The Tribunal's fees and expenses of S$66,910.89.

    (ii)    SIAC administrative fees and expenses: S$12,528.91.

### Place of Arbitration: Singapore

Dated this 10th day of April, 2015.

*GOH JOON SENG*
*Arbitrator*

42

# AT THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

## IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE SIAC RULES (4TH EDITION, 1 JULY 2010) ("SIAC RULES 2010")

### ARB No. 123 of 2011

Between

## RACHAN DAMIDI REDDY
*(Claimant)*

And

## RASHID A. BUTTAR
*(Respondent)*

---

## CLARIFICATION OF AWARD

---

Dated this 2nd day of June 2015

Registered in SIAC Registry of Awards as:
Award No. 042 of 2015
on 03 June 2015



AT THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE

IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION
RULES OF THE SINGAPORE INTERNATIONAL ARBITRATION CENTRE
SIAC RULES (4TH EDITION, 1 JULY 2010)

SIAC ARBITRATION NO: 123 OF 2011

Between

RACHAN DAMIDI REDDY

... *Claimant*

And

RASHID A. BUTTAR

... *Respondent*

| | |
|---|---|
| *Coram:* | GOH JOON SENG, *Arbitrator* |
| *Counsel:* | *Andy Leck, Shum Wai Keong and Jennifer Fong (Baker & McKenzie.Wong & Leow) for the Claimant* |
| | *Sesinando S. Santayana, Jr. (The Law Firm of Castillo, Bonifacio andSantayana) for the Respondent* |
| *Hearing:* | *4 July 2014* |

## CLARIFICATION OF AWARD

1. On 10 May 2015, I made a Final Award ("Award") in this matter.

2. On 14 May 2015, Counsel for the Claimant requested the Tribunal to "*make an additional award to expressly address the Claimant's claims for interest presented in the arbitral proceedings but not dealt with in the award, or to correct the Award pursuant to Rule 29.3 and/or Rule 29.1 of the SIAC Rules 2010.*".

1

3. Pursuant to Rule 29.1 and/or Rule 29.4 of the Arbitration Rules of the Singapore International Arbitration Centre SIAC Rules (4th Edition, 1 July 2010) and all other powers thereto enabling, I hereby certify as follows:

   (1) In paragraph 64 (c) of my Award of 10 April 2015, I awarded the Claimant *"interest on the sum of US$1,550,000.00 at the rate of 5.33% per annum from date of commencement of this Arbitration to date of this Award."* By section 20(3) of the International Arbitration Act (Chapter 143A), the amount awarded carries interest from the date of the Award to date of payment at the same rate as a judgment debt. The effect of my Award read with section 20(3) of the International Arbitration Act (Chapter 143A) is therefore that the amount awarded carries interest from the date of commencement of this Arbitration to the date of payment at the operative rate of 5.33% per annum.

   (2) In paragraph 68 of my Award, the award on costs is to carry interest at the rate of 5.33% per annum from the date of my Award to date of payment.

Place of Arbitration: Singapore

Dated this 2nd day of June, 2015.

**GOH JOON SENG**
*Arbitrator*

2